## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



**FILED**

Sep 28 2016, 6:36 am

**CLERK**
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Frederick Vaiana
Voyles Zahn & Paul
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE

Gregory F. Zoeller
Attorney General of Indiana

Justin F. Roebel
Deputy Attorney General
Indianapolis, Indiana

## IN THE
# COURT OF APPEALS OF INDIANA

Taiwan Lundy,
*Appellant-Defendant*,

v.

State of Indiana,
*Appellee-Plaintiff*.

September 28, 2016

Court of Appeals Case No.
49A04-1509-CR-1447

Appeal from the Marion Superior Court

The Honorable Mark D. Stoner, Judge

Trial Court Cause No.
49G06-1311-FA-72474

**Brown, Judge.**

[1] Taiwan Lundy appeals his sentence for twenty-nine convictions in connection with an extended home invasion. Lundy raises one issue which we revise and restate as whether the trial court abused its discretion in sentencing him. We affirm.

## Facts and Procedural History

[2] At approximately 5:00 a.m. on October 24, 2013, Adrian Anthony, Trae Spells, Michael Pugh, and Lundy broke into a home in Indianapolis belonging to R.N. and B.N. One of the men entered the bedroom and held R.N. and B.N. at gunpoint, and the other men grabbed their cell phones and ransacked the house, taking anything of value including jewelry, purses, a vase containing coins, cologne, watches, electronics, DVD players, an iPod, and televisions.

[3] The men demanded money, and R.N. indicated their money was in the bank. One of the men fired a gun within a foot of R.N.'s head, shooting the wall. R.N. identified his debit card and wrote down his pin code so the men could use the ATM, and one of the men drove B.N.'s Jeep to an ATM. The men at the house stated that, if the man who went to the ATM was unable to obtain money, they were going to kill R.N. and B.N. The man who went to the ATM returned and stated "[t]hey lied. It didn't work. The pin code didn't work" and "[l]et's shoot them." Transcript at 69, 219.

[4] The men took R.N. and B.N. from the bedroom to a living room, ordered them to their knees, and placed a pillow over their heads. R.N. and B.N. believed they were going to be shot at that point. The men kicked R.N. in the head, and

R.N. pleaded with the men until they agreed to take him to the ATM. R.N. drove Anthony, who held R.N. at gunpoint, to the ATM. R.N. attempted to withdraw money, but was unsuccessful because access to his account had been locked due to the number of unsuccessful prior attempted transactions, and Anthony stated "[y]ou lied to me again. You guys are dead. You are dead absolutely." *Id.* at 79. R.N. told Anthony that B.N. had a separate account with a separate debit card, Anthony agreed to retrieve B.N.'s debit card, and R.N. drove back to the house. While Anthony and R.N. were traveling to and from the ATM, the other men removed televisions from the walls. One of the men forced B.N. to lay on the floor with a blanket over her head, rubbed her back, butt, and breasts, and stated that "if he had a condom he would rape [her] but he didn't want his DNA inside" her. *Id.* at 229.

[5] After R.N. and Anthony returned to the house, Anthony forced B.N. at gunpoint to drive him to the ATM. There, B.N. attempted to withdraw $800 but it did not work, and then she successfully withdrew $500. B.N. then unsuccessfully attempted to make additional withdrawals. Anthony told B.N. to tell the other men that she was able to withdraw only $400. Meanwhile, as Anthony and B.N. were traveling to and from the ATM, Spells asked R.N. for a passcode to a computer, which R.N. did not provide. R.N. was tied up with an orange extension cord, and Spells and Lundy struck R.N. with an iron urn, shattered a glass vase on his head, hit him in the head with a pizza stone, and punched him in the face.

[6]  Anthony and B.N. arrived back at the house, the men bound B.N. with a rope or cord and duct tape, and one of the men wrapped a cord around B.N.'s neck and "touched [her] vagina really forcefully." *Id.* at 247. The men struck R.N. and B.N. on their heads severely and repeatedly with a DVD player, and the blows were so forceful that B.N. at first thought she had been shot. The men loaded items into R.N. and B.N.'s Jeep and Subaru. Spells initially attempted to drive the Subaru but did not know how to drive a manual transmission, and he left the vehicle against a light post in the front yard of the house. After the men left, R.N. and B.N. removed their restraints, ran to a neighbor's house, and called 911. The police discovered the Jeep and recovered some of the stolen items.

[7]  The State, in an amended charging information, alleged Lundy, Anthony, Spells, and Pugh committed burglary as a class A felony, conspiracy to commit burglary as a class A felony, three counts of robbery as class B felonies, eleven counts of criminal confinement as class B felonies, two counts of intimidation as class C felonies, attempted robbery as a class B felony, thirteen counts of forgery as class C felonies, conspiracy to commit forgery as a class C felony, sexual battery as a class C felony, criminal deviate conduct as a class A felony, three counts of battery as class C felonies, and two counts of carjacking as class B felonies. Anthony, Pugh, and Lundy were tried together, and Spells testified that he entered a plea agreement, that his understanding was that he could be sentenced to fifty to eighty years, and that he agreed to testify in this case. The jury was given an instruction on accomplice liability. The jury found Lundy

guilty on thirty counts and not guilty on one count of battery as a class C felony, the State dismissed nine counts, and the court merged the conviction for conspiracy to commit burglary with the conviction for burglary. Ultimately, judgments of conviction were entered on the following: burglary as a class A felony under Count 1; robbery as class B felonies under Counts 3, 4, and 28; criminal confinement as class B felonies under Counts 10, 22, 23, 26, 27, and 37; attempted robbery as a class B felony under Count 11; forgery as class C felonies under Counts 12 through 21 and 29 through 31; conspiracy to commit forgery under Count 32; battery as class C felonies under Counts 33 and 38; and carjacking as class B felonies under Counts 39 and 40.

[8] At sentencing, Lundy's counsel elicited testimony from Lundy's mother that she attempted to convince Lundy to testify but that "he was scared of the repercussions and the fact that he's going to have to do all these years in jail with these same people and he doesn't want it to come back on him and he doesn't want anything to come back on his sisters in the street." Transcript at 978. Lundy's counsel argued in part:

> I would ask the Court to take into consideration, uh, Mr. Spells' sentence; and he did cooperate, he received a 70-year sentence from my understanding, based upon his cooperation. But I think Mr. Lundy is even differently, differently situated from Mr. Spells, and the Court saw what Mr. Spells was all about first hand when he came into court and testified in this case. Um. By all accounts, Mr. Spells maybe not an overt admission, but by all accounts Mr. Spells was the, was the individual who was responsible for tying Ms. Nowak up, um, who was responsible for the unspeakable things that were done to her, that, that, you

know, will never be forgotten and she'll have to deal with for the rest of her life. And that individual received a 70-year sentence. . . .

But we're asking for a fifty-year sentence, and in mitigation, we'd ask the Court to consider Mr. Lundy's relevant youth at the time of the occurrence of this case; his mental health issues. I believe that he has addiction issues. I think he's had addiction issues since birth. Um. His youth and his upbringing which in the beginning he was an adopted child, and I think that's clear from the presentence investigation report.

The aggravators are also clear. He does have some, some criminal history, as his mom testified to. However, that criminal history pales in comparison to what he's looking at here today and what he's been convicted of. And he, and he knows that. One last thing, Your Honor, Mr. Lundy is not making a statement of allocution, but in some respects, he made a statement, or made his statement of allocution to the community when he went, when he went on with Fox 59 and gave his statement of apology and sorrow for his actions.

*Id.* at 999-1002. The court asked whether Spells received seventy years in this case or in all cases, and the prosecutor responded that the sentence "was a combination" and "[h]e got forty years on this case and thirty on the Court Four case." *Id.* at 1004.

[9] The trial court later stated:

Now, as to Mr. Lundy, Court notes as mitigating circumstances, as I indicated earlier, that substance abuse evaluation and treatment, mental health evaluation and treatment, as the presentence report makes clear that the defendant was adopted, was born with Fetal Alcohol Syndrome. Unlike the other defendants, he was not involved in the College Avenue matter.

The defense did cite that he is relatively young. The Court, however, given his, the length of his criminal history which I'll go into in just a minute, and noted that all of the other defendants are also relatively young age, Court doesn't find that to be a significant mitigating circumstance.

In terms of aggravating circumstances for Mr. Lundy's criminal history, Court notes that his first referral was when he was thirteen for minor misdemeanor offenses. Most significant juvenile matter then occurs in 2007 with a theft true finding that would have been a D felony if committed by an adult given an opportunity to be placed on probation. . . . Indicated that he has had a number of opportunities to receive treatment in the juvenile system and for whatever reason was unsuccessful with that. He had a second true finding in 2010 at the age of seventeen for a theft which would have been a felony if committed by an adult.

Also had a criminal mischief in terms of destruction of property in 2010 which would have been a misdemeanor. . . . But the defendant was over the age of eighteen when he committed theft under the cause number in Court 15 under the cause number ending in 738. Disposition for that was in June of 2011. He had a felony conviction for that. Given an opportunity to be placed on probation. His probation was revoked. He was sent to the Department of Correction and was released from the Department of Correction and had only been out from the Department of Correction for five or six months when these offenses occurred.

So, those are the individual aggravating and mitigating circumstances as it relates to each defendant. Court notes as an overall aggravating circumstance as the State of Indiana indicated, that this was [a] significant crime in the sense that it involved the sanctity of the home, and done at a time in which individuals would have been expected . . . in the home, and the Court believes on the facts and circumstances that it was clear the defendants knew that, counted on that, and yet invaded the home

anyway. But having gone into the home, that they were engaged in a significant act of terror as to the victims in this case. . . .

[Y]ou guys did more than steal. You brutalized, you terrorized, you victimized them in ways that were just absolutely unnecessary for obtaining property, which is what you were after. . . . The violence that you did, the sexual activity you did wasn't necessary. It just simply wasn't necessary and it creates a greater aggravating circumstance than most burglaries and that is true for each and every one of you.

Mr. Lundy's attorney has asked for consideration and the Court will be giving consideration in the sense that one, he wasn't involved in the College Avenue case. Two, that he has a less significant criminal history. But the bottom line is, is that, the Court can't give you a significant mitigating circumstance because you didn't cooperate, because you didn't do what Mr. Spells did. Even when Mr. Spells lied, and he clearly did, about some of the things that happened in the case, he still came forward and decided to do something in terms of the right thing to do. And if you had only listened, Mr. Lundy, to your mother and your attorney, your sentence would have been significantly different than what it is. Because everyone really deserved to know exactly what happened. And between Mr. Spells, and you Mr. Lundy, we might have been able to sift out who was cheating in terms of their own involvement, and be able to figure out who exactly did what.

But because you didn't come forward, because you chose to honor the code of lawbreakers instead of honoring the code of doing the right thing in terms of telling the truth, you sit here and you're going to get a significant sentence that you otherwise wouldn't have gotten. And that's a tragedy for you, but that's the choice you made. You choose to run with these guys, you choose to stay with these guys, and not do the right thing. And so, the Court wanted to address you specifically because that doesn't – your co-defendants aren't in that category.

*Id.* at 1016-1018, 1020-1022.

[10] The court sentenced Lundy to forty years on Count 1; ten years on Counts 3, 4, 10, 11, 22, 23, 26, 27, 28, 37, 39, and 40; and four years on Counts 12 through 21, 29 through 33, and 38. The court ordered that Counts 1, 3, 12, 33, 38, and 39 be served consecutively and that all other counts be served concurrently, for an aggregate sentence of seventy-two years.[1]

## *Discussion*

[11] The issue is whether the trial court abused its discretion in sentencing Lundy. We review the trial court's sentence for an abuse of discretion. *Anglemyer v. State*, 868 N.E.2d 482, 490 (Ind. 2007), *clarified on reh'g,* 875 N.E.2d 218 (Ind. 2007). An abuse of discretion occurs if the decision is clearly against the logic and effect of the facts and circumstances. *Id.*

[12] Lundy asserts the trial court abused its discretion when it impermissibly punished him for exercising his constitutional rights to a trial by jury and freedom from self-incrimination. Lundy argues that the court's comments at his sentencing hearing, "if allowed to stand, hauntingly chill the exercise of these core constitutional principles" because, "as affirmatively stated by the trial court to Lundy, should an accused choose to exercise one or both of these rights," the "consequences of doing so will result in a significantly greater

---

[1] The court sentenced Pugh and Anthony to aggregate terms of eighty-eight years and ordered that the sentences be served consecutive to the sentences they received for their participation in the College Avenue case.

sentence than if he had not elected to proceed to jury trial and/or had elected to forfeit his right against self-incrimination." Appellant's Brief at 15-16. Lundy argues that the trial court's statements "plainly and affirmatively outline that he received a harsher sentence than he otherwise would have had he not elected to exercise his basic constitutional rights to a trial by jury and to be free from self-incrimination." Id. at 18.

[13] Lundy states that he "is mindful of the benefits of plea bargaining" and "agrees that it is constitutionally sound for a defendant to receive leniency at sentencing in consideration for a decision to bargain with the state and correspondingly utilize less resources of the parties and the courts," but that "[t]he problem presented at [his] sentencing is the fact that the trial court affirmatively outlined its reasons for imposing a harsher sentence upon him," "[t]hose reasons principally being he exercised his right to a trial by jury along with Pugh and Anthony and elected not to testify against them." *Id.* at 19-20. Lundy argues this court could exercise its authority under Ind. Appellate Rule 7(B) and impose a sentence it feels is appropriate, could remand the case for resentencing, or could remand the case for resentencing with directions, and he asks this court to consider a sentence of fifty years as a realistic starting point in fashioning a remedy to the issues presented regarding his sentencing.

[14] The State maintains that the court did not abuse its discretion in sentencing Lundy to an aggregate sentence of seventy-two years, that the law requires courts to consider cooperation with the State and guilty pleas as mitigating circumstances at sentencing, and that here the court did not punish Lundy for

failing to assist the police or for demanding a jury trial but instead explained that a significantly mitigated sentence, such as the sentence Spells received for cooperating and testifying, was not merited because Lundy did not cooperate. The State argues that the trial court's statements were made in direct response to Lundy's arguments that he should be given a shorter sentence than Spells because of his lesser involvement, that as such the court was commenting on Spells's entitlement to mitigation for cooperating and pleading guilty and was not suggesting Lundy was being punished for exercising his constitutional rights, and that these issues only became relevant because Lundy asked the court to consider Spells's sentence in fashioning Lundy's sentence. The State also asserts that Lundy does not present any significant indicia that the court enhanced his sentence to punish him for exercising his right to a jury trial or right against self-incrimination, that nothing in the court's statement indicates it was holding Lundy's decision to go to trial against him, and that Lundy concedes that it is constitutionally sound for a defendant to receive leniency at sentencing in consideration for a guilty plea.

[15] The Indiana Supreme Court has observed that it is improper to rely on a defendant's maintaining his innocence as an aggravator and that a defendant's constitutional privilege against self-incrimination protects him from having to confess to the police. *Angleton v. State*, 686 N.E.2d 803, 816 (Ind. 1997), *reh'g denied*. Further, it is constitutionally impermissible for a trial court to impose a more severe sentence because the defendant has chosen to stand trial rather

than plead guilty. *Hill v. State*, 499 N.E.2d 1103, 1107 (Ind. 1986) (citing *Walker v. State*, 454 N.E.2d 425, 429 (Ind. Ct. App. 1983), *trans. denied*).

[16] The Court has further observed that "[t]he propriety of using leniency to encourage guilty pleas, however, has also been upheld." *Id.* (citing *Gajdos v. State*, 462 N.E.2d 1017, 1025 (Ind. 1984) (stating a defendant who enters a guilty plea "has extended a substantial benefit to the state and deserves to have a substantial benefit extended to him in return" and that "when the defendant proceeds to trial and his accomplice pleads guilty, the sentences need not be identical") (citations omitted)). Further, a defendant who pleads guilty deserves to have mitigating weight extended to the guilty plea in return, and the significance of this mitigating factor will vary from case to case, based in part on the benefit extended to the State or the victim. *Francis v. State*, 817 N.E.2d 235, 238 (Ind. 2004).

[17] In *Hill*, the Court stated that, while leniency in sentencing is constitutionally permissible as an incentive for an otherwise proper plea of guilty, a more severe sentence may not be imposed upon a defendant because he foregoes the opportunity to plead guilty and exercises his right to trial by jury. 499 N.E.2d at 1107. The Court stated that "[w]hether the severity of a particular sentence was improperly influenced by a defendant's jury trial election requires an individualized consideration" and held that "[i]n the present case, we are not directed to, nor do we find, anything in the record indicating that the defendant's decision to proceed with jury trial affected the severity of the sentence ultimately imposed." *Id.* The Court noted that it did not "find any

indication that the trial judge was involved in the defendant's plea negotiations, nor did the judge encourage the defendant to plead guilty, or threaten him with a more severe sentence if convicted following jury trial." *Id.* The Court also noted that the trial court reviewed the facts of the case against the defendant's substantial history of criminal activity and concluded that, "[a]bsent a significant indicia that the defendant's exercise of his jury trial right may have contributed to the severity of his resulting sentence, we will not remand for resentencing upon this issue." *Id.*

[18] In *Pauley v. State*, Albert Pauley and Steve Phillips were at the home of Robert Patchett and, when Phillip Paul arrived, he was beaten and stabbed. 668 N.E.2d 1212, 1213 (Ind. 1996). Pauley was found guilty of murder. *Id.* He and Phillips received sixty years for their roles in the crime, and Patchett pled guilty and received thirty years. *Id.* On appeal, Pauley argued he was penalized for invoking his right to trial by jury. *Id.* The Court discussed *Hill* and concluded that Pauley did not demonstrate that the trial court enhanced his sentence because he elected to go to trial. *Id.*

[19] We observe that Lundy did not object to his sentence below on the basis that it represented punishment for maintaining his innocence or insisting on a trial by jury and does not argue or point to the record on appeal that the trial court was involved in his plea negotiations, encouraged him to plead guilty, or threatened him with a more severe sentence if convicted following jury trial. We further observe that Lundy's counsel asked the court to take Spells's sentence into consideration and argued that Spells was the person responsible for the actions

against B.N. Lundy's counsel requested that the court sentence Lundy to fifty years and asked it to consider Lundy's relative youth, mental health, addiction issues, and expression to the community of his sorrow for his actions. In response, the court stated that "the bottom line" was that the court could not give Lundy "a significant mitigating circumstance" because he "didn't do what Mr. Spells did." Transcript at 1021. The court's comments related to the reasons Spells could receive the sentence he received for his participation, namely, his guilty plea and cooperation extended a substantial benefit to the State. *See Gajdos*, 462 N.E.2d at 1025 (stating, "when the defendant proceeds to trial and his accomplice pleads guilty, the sentences need not be identical"). We further note that, as set forth in the record and in part above, the court identified aggravating and mitigating circumstances, which Lundy does not challenge, and explained its reasons for rejecting Lundy's argument regarding his relative participation and for attributing little weight to certain mitigating circumstances advanced by his counsel. The court noted that Lundy was not involved in another matter which the other defendants had been involved, noted his age and why it did not find his relative age to be a significant mitigating circumstance, reviewed his criminal history, and discussed the brutal nature of the offenses committed during the course of the home invasion.

## Conclusion

[20] Based upon the record, we conclude that Lundy has not demonstrated that the trial court enhanced his sentence for impermissible reasons and that it did not

abuse its discretion in imposing an aggregate sentence of seventy-two years for Lundy's crimes.

[21] For the foregoing reasons, we affirm Lundy's sentence.

[22] Affirmed.

Baker, J., and May, J., concur.